IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 14-cv-01984-NYW

SHANNON WILLIAMS,

      Plaintiff,

v.

CAROLYN W. COLVIN, Acting Commissioner of Social Security,

      Defendant.

---

MEMORANDUM OPINION AND ORDER

---

Magistrate Judge Nina Y. Wang

This civil action comes before the court pursuant to Titles II and XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 401-33 and 1381-83(c) for review of the Acting Commissioner of Social Security's final decision denying Plaintiff, Shannon Williams's, application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). Pursuant to the Order of Reference dated July 9, 2015 [#21], this civil action was referred to the Magistrate Judge for a decision on the merits pursuant to 28 U.S.C. § 636(c), Fed. R. Civ. P. 73, and D.C.COLO.LCivR 72.2. [#42]. The court has carefully considered the Complaint filed July 17, 2014 [#1], Defendant's Answer filed January 20, 2015 [#9], Plaintiff's Opening Brief filed March 30, 2015 [#13], Defendant's Response Brief filed April 22, 2015 [#16], the entire case file, the administrative record, and applicable case law. For the following reasons, I AFFIRM the Commissioner's decision.

# BACKGROUND

Plaintiff Shannon Williams ("Plaintiff" or "Ms. Williams") filed an application for DIB under Title II of the Act and an application for SSI under Title XVI of the Act on November 30, 2011, alleging that she became disabled on August 1, 2010.  *See* [#10-2 at 46].[1]  These claims were initially denied on March 21, 2012, and Plaintiff requested a hearing before an administrative law judge.  [#10-2 at 41, 46].  Ms. Williams appeared before Administrative Law Judge William Musseman ("ALJ") on January 25, 2013.  [#10-2 at 70-104].  The ALJ issued an unfavorable decision on February 11, 2013, finding that Ms. Williams had not been disabled from the alleged date of the onset of disability through the date of his decision.  [#10-2 at 43-59].  On April 15, 2013, Plaintiff filed a "Request for Review of Hearing Decision," which the Appeals Council denied on May 13, 2014.  [#10-2 at 2].  Ms. Williams thereafter timely filed this civil action.

In the Adult Disability Report, Ms. Williams represented that she had obtained her GED and the ALJ determined that she has "at least a high school education and is able to communicate in English."  [#10-6 at 16; #10-2 at 58].  The ALJ initially found that Plaintiff met the insured status requirements of the Act through December 31, 2015 and that she had not engaged in substantial gainful activity since August 1, 2010, the alleged onset date.  [#10-2 at 48].

At the administrative hearing, at which she was represented by counsel, Plaintiff testified that she suffers from a seizure disorder, bipolar disorder, and back problems.  [#10-2 at 74].  With regard to her back pain, she stated she feels stiffness in her lower back that prevents her from bending over easily, she cannot stand for long periods of time, she cannot sit for long

---

[1]  The court uses this designation to refer to the Electronic Court Filing system ("ECF") document number and the ECF page number of that document.  Plaintiff's citations and Defendant's citations refer to the page number of the Administrative Record, or, where applicable, the page number of a brief. *See, e.g.,* [#13 at 1; #16 at 2].

periods of time, and she cannot sleep on her right side.  [#10-2 at 74-75].  Plaintiff further stated

that she has difficulty driving her car because she experiences "shooting pains in [her] lower

back" and down her left leg when she stretches to depress the clutch.  [#10-2 at 75].  Plaintiff

testified that this sharp pain "would come and go," and that she "constantly had an ache in [her]

back though."  [#10-2 at 76].  The shoots of pain varied from "several times a day" to "every

other day," depending on Plaintiff's activity.  [#10-2 at 77].  Lying on her right side, driving her

car, and standing to wash dishes exacerbated the pain.  [*Id.*]  Plaintiff testified that generally,

standing in excess of fifteen minutes and sitting in excess of twenty-five minutes cause her

significant pain.  [#10-2 at 77-78].  However, Plaintiff also testified that she had received a

spinal fusion on November 15, 2012 that was a success "[f]or the most part," but "caused a

different complication at that time."  [#10-2 at 78].  Following the spinal fusion, she could sleep

on her right side and stand for approximately twenty-five minutes, but could not sit for any

longer than twenty-five minutes.  [#10-2 at 79].  Prior to the surgery, Plaintiff was able to lift her

four-year old daughter on "a good day," which totaled approximately three days each month.

Following the surgery, she could not lift her daughter at all.  [#10-2 at 80-81].  Rails are installed

around Plaintiff's commode in her home, which her daughter uses to pull herself out of the

bathtub.  [#10-2 at 82].  Also following the surgery, Plaintiff participated in three physical

therapy sessions, received epidural steroid injections, and was taking a muscle relaxer.  [#10-2 at

91].  At the time of the hearing, Plaintiff was using Vicodin, Flexeril, and Neurontin.  [#10-2 at

92].  She complained that the surgery left her with significant pain in her left foot, which

interferes with her ability to walk and causes her to lean on her right foot when standing.  [*Id.*]

Plaintiff also testified that she suffers, on average, twenty-five seizures a month; one

seizure may last a matter of minutes, but she has "episodes" along with the seizures which may

last up to an hour and during which she may lose consciousness.  [#10-2 at 83-84].  After a seizure towards the end of 2011 that left her unconscious in a parking lot, she was transported by an ambulance to Memorial North Hospital.  [#10-2 at 86].  Plaintiff nonetheless continues to drive a car, though "[i]t concerns [her]."  [#10-2 at 87].  She does not leave the house if she has had a seizure that day, and she has friends and a roommate whom she asks to drive her if she must leave her house.  [#10-2 at 87-88].  Plaintiff has also sought treatment for bipolar disorder, which she described at the hearing as "more of a manic thing than a depressive thing," and which causes her to hallucinate.  [#10-2 at 89].  She testified that she uses medicine to treat the disorder but could not recall the name of the medicine, and she suffers memory loss as a result of using it.  [#10-2 at 93-94].  At one point, when she began to hallucinate she checked herself into a facility overnight.  [#10-2 at 89-90].  Plaintiff also endured headaches that abated after she began taking Lamictal and Gabapentin.  [#10-2 at 95].  Finally, Plaintiff testified that her roommate takes care of her daughter when she is in the hospital or another facility overnight.  Her roommate contributes heavily to the cooking and cleaning in the home, though Plaintiff has begun to cook since the spinal fusion surgery. [#10-2 at 91].

Robert Van Iverstein testified as a vocational expert ("VE").  The ALJ first asked the VE to provide the exertional and skill level involved in Plaintiff's previous work.  The VE responded that the following jobs were commensurate with Plaintiff's work history: dining room attendant; waitress; child care attendant; production assembly position in candy-company; ticket agent; security person for casino; and manager in fast food restaurant.  [#10-2 at 99].  The ALJ then posed the following hypothetical question: would an individual of Plaintiff's age and educational background be able to perform the forgoing jobs if she is "limited to an exertional level and a full range of sedentary, non-exertionally [sic], occasional bending, squatting, occasional leg or foot

4

controls, no unprotected heights, no moving machinery, and no hazardous work areas." [#10-2 at 99-100]. The VE responded in the negative on the basis that the foregoing jobs "are all light [exertion] and above." [#10-2 at 100]. In response to the ALJ's question whether any job would be compatible with the hypothetical worker, the VE suggested the following sedentary positions: telequotation (phonetic) clerk; surveillance systems monitor; and a credit checker or call out operator. [#10-2 at 100-101]. The ALJ then asked whether positions in the economy exist for a hypothetical worker who, "based on an inability to be attentive to task for unpredictable periods of time on an unpredictable basis on an almost daily basis, and inability, due to pain, to be at the workplace all or part of a day...25 days out of a month." [#10-2 at 101]. The VE reported that no competitive employment is available to such a hypothetical worker. [*Id.*]   In response to questioning by Plaintiff's attorney, the VE stated that a person who needs to leave work early more than two times a month because of unpredicted seizure activity would likely be terminated from any job; and a person who experienced a seizure that incapacitated her for five or six minutes, two or three times a month for several months would be unable to sustain employment. [#10-2 at 102-103].

The ALJ issued his written decision on February 11, 2013, concluding that Ms. Williams has not been disabled within the meaning of the Act "from August 1, 2010 through the date of this decision." [#10-2 at 46]. Plaintiff requested review of the ALJ's decision and submitted new evidence, which the Appeals Council incorporated into the record: representative correspondence, with contentions, dated April 21, 2014; medical records from Peak Vista Community Health Centers, dated January 3, 2012 through January 24, 2013; medical records from Peak Vista Community Health Centers, dated February 15, 2013 through May 23, 2013; and medical records from Memorial Health System Radiology and Imaging Department, dated

July 26, 2013.  [#10-2 at 6; #10-6 at 65-69; #10-16 at 75-93; #10-17 at 2-37, 38].  The Appeals Council denied Plaintiff's request on May 13, 2014.  [#10-2 at 2-5].  The decision of the ALJ then became the final decision of the Commissioner.  20 C.F.R. § 404.981; *Nielson v. Sullivan*, 992 F.2d 1118, 1119 (10th Cir. 1993) (citation omitted).  Plaintiff filed this action on July 17, 2014.  The court has jurisdiction to review the final decision of the Commissioner.  42 U.S.C. § 405(g).

## STANDARD OF REVIEW

In reviewing the Commissioner's final decision, the court is limited to determining whether the decision adheres to applicable legal standards and is supported by substantial evidence in the record as a whole.  *Berna v. Chater*, 101 F.3d 631, 632 (10th Cir. 1996) (citation omitted); *Pisciotta v. Astrue,* 500 F.3d 1074, 1075 (10th Cir. 2007).  The court may not reverse an ALJ simply because she may have reached a different result based on the record; the question instead is whether there is substantial evidence showing that the ALJ was justified in her decision.  *See Ellison v. Sullivan,* 929 F.2d 534, 536 (10th Cir. 1990).  "Substantial evidence is more than a mere scintilla and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Flaherty v. Astrue,* 515 F.3d 1067, 1070 (10th Cir. 2007) (internal citation omitted).  Moreover, the court "may neither reweigh the evidence nor substitute [its] judgment for that of the agency." *White v. Massanari*, 271 F.3d 1256, 1260 (10th Cir. 2001), *as amended on denial of reh'g* (April 5, 2002).  *See also Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) ("The possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence.") (internal quotation marks and citation omitted).  However, "[e]vidence is not substantial if it is overwhelmed by other evidence in the record or constitutes mere conclusion."

*Musgrave v. Sullivan,* 966 F.2d 1371, 1374 (10th Cir. 1992) (internal citation omitted).   The court will not "reweigh the evidence or retry the case," but must "meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." *Flaherty,* 515 F.3d at 1070 (internal citation omitted).   Nevertheless, "if the ALJ failed to apply the correct legal test, there is a ground for reversal apart from a lack of substantial evidence." *Thompson v. Sullivan,* 987 F.2d 1482, 1487 (10th Cir. 1993) (internal citation omitted).

## ANALYSIS

### A.      The ALJ's Decision

An individual is eligible for DIB benefits under the Act if she is insured, has not attained retirement age, has filed an application for DIB, and is under a disability as defined in the Act. 42 U.S.C. § 423(a)(1).   Supplemental Security Income is available to an individual who is financially eligible, files an application for SSI, and is disabled as defined in the Act.   42 U.S.C. § 1382.   An individual is determined to be under a disability only if her "physical or mental impairment or impairments are of such severity that [s]he is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy…." 42 U.S.C. § 423(d)(2)(A).   The disabling impairment must last, or be expected to last, for at least 12 consecutive months. *See Barnhart v. Walton*, 535 U.S. 212, 214-15 (2002).   Additionally, the claimant must prove she was disabled prior to her date last insured. *Flaherty*, 515 F.3d at 1069.

The Commissioner has developed a five-step evaluation process for determining whether a claimant is disabled under the Act.   20 C.F.R. § 404.1520(a)(4)(v).   *See also Williams v. Bowen*, 844 F.2d 748, 750-52 (10th Cir. 1988) (describing the five steps in detail). "If a

determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." *Williams*, 844 F.2d at 750.   Step one determines whether the claimant is engaged in substantial gainful activity; if so, disability benefits are denied.  *Id.*  Step two considers "whether the claimant has a medically severe impairment or combination of impairments," as governed by the Secretary's severity regulations.  *Id.*; *see also* 20 C.F.R. § 404.1520(e).  If the claimant is unable to show that her impairments would have more than a minimal effect on her ability to do basic work activities, she is not eligible for disability benefits.  If, however, the claimant presents medical evidence and makes the *de minimis* showing of medical severity, the decision maker proceeds to step three.  *Williams*, 844 F.2d at 750.  Step three "determines whether the impairment is equivalent to one of a number of listed impairments that the Secretary acknowledges are so severe as to preclude substantial gainful activity."  *Id.*  At step four of the evaluation process, the ALJ must determine a claimant's Residual Functional Capacity (RFC), which defines what the claimant is still "functionally capable of doing on a regular and continuing basis, despite [her] impairments: the claimant's maximum sustained work capability."  *Williams*, 844 F.2d at 751.  The ALJ compares the RFC to the claimant's past relevant work to determine whether the claimant can resume such work. *See Barnes v. Colvin*, No. 14-1341, 2015 WL 3775669, at *2 (10th Cir. June 18, 2015) (internal quotation marks omitted) (citing *Winfrey v. Chater*, 92 F.3d 1017, 1023 (10th Cir. 1996) (noting that the step-four analysis includes three phases: (1) "evaluat[ing] a claimant's physical and mental [RFC]"; (2) "determin[ing] the physical and mental demands of the claimant's past relevant work"; and (3) assessing "whether the claimant has the ability to meet the job demands found in phase two despite the [RFC] found in phase one.")).  "The claimant bears the burden of

proof through step four of the analysis." *Neilson v. Sullivan*, 992 F.2d 1118, 1120 (10th Cir. 1993).

At step five, the burden shifts to the Commissioner to show that a claimant can perform work that exists in the national economy, taking into account the claimant's RFC, age, education, and work experience. *Neilson*, 992 F.2d at 1120.

> . . . A claimant's RFC to do work is what the claimant is still functionally capable of doing on a regular and continuing basis, despite his impairments: the claimant's maximum sustained work capability. The decision maker first determines the type of work, based on physical exertion (strength) requirements, that the claimant has the RFC to perform. In this context, work existing in the economy is classified as sedentary, light, medium, heavy, and very heavy. To determine the claimant's "RFC category," the decision maker assesses a claimant's physical abilities and, consequently, takes into account the claimant's exertional limitations (i.e., limitations in meeting the strength requirements of work). . . .

> If a conclusion of "not disabled" results, this means that a significant number of jobs exist in the national economy for which the claimant is still exertionally capable of performing. However, . . . [t]he decision maker must then consider all relevant facts to determine whether claimant's work capability is further diminished in terms of jobs contraindicated by nonexertional limitations.
>
> …

> Nonexertional limitations may include or stem from sensory impairments; epilepsy; mental impairments, such as the inability to understand, to carry out and remember instructions, and to respond appropriately in a work setting; postural and manipulative disabilities; psychiatric disorders; chronic alcoholism; drug dependence; dizziness; and pain….

*Williams*, 844 F.2d at 751-52. The Commissioner can meet his or her burden by the testimony of a vocational expert. *Tackett v. Apfel*, 180 F.3d 1094, 1098–1099, 1101 (9th Cir. 1999).

The ALJ first determined that Ms. Williams was insured for disability through December 31, 2015. [#10-2 at 46, 48]. Next, following the five-step evaluation process, the ALJ determined that Ms. Williams: (1) had not engaged in substantial gainful activity between the alleged onset date of August 1, 2010 and her date last insured of December 31, 2015; (2) had

severe impairments of "seizure disorder and disorder of the back"; and (3) did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in Title 20, Chapter III, Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, 416.926). [#10-2 at 48-56]. At step four, the ALJ found that Plaintiff had an RFC to perform sedentary work as defined in 20 C.F.R. §§ 404.1567(a) and 416.967(a), "except occasional bending and squatting; occasional use of foot/leg controls; no unprotected heights; no moving machinery; and no hazardous work areas." [#10-2 at 56]. The ALJ considered Plaintiff's age of 28 years old on the alleged disability onset date, that her education was the equivalent of at least a high school education, the fact that she had no past relevant work experience, and her RFC, and determined that jobs exist in the national economy in significant numbers that Plaintiff can perform. [#10-2 at 58-59]. Accordingly, the ALJ concluded that Plaintiff was not disabled.

First, Ms. Williams asserts the ALJ failed to develop the record regarding the functional effects of her physical and mental conditions. Second, Ms. Williams contends the ALJ's findings regarding her physical RFC, including but not limited to her capacity to sit without considerable pain, are not supported by substantial evidence. Third, Ms. Williams argues the ALJ erred in determining her mental impairments are not severe, and in the alternative, erred in failing to consider the impairments in assessing her RFC. Finally, Ms. Williams argues the ALJ failed to consider whether her seizure disorder equaled the severity of listing 12.07 in 20 C.F.R. Part 404, Subpart P, Appendix 1, and in the alternative, erred in failing to consider the disorder in assessing her RFC. *See* [#13].

B.     **ALJ's Development of The Record**

Plaintiff argues that the ALJ failed to develop the record regarding "the functional effects of Ms. Williams's physical and mental conditions." [#13 at 21]. Specifically, Plaintiff asserts the ALJ failed to solicit expert opinion evidence as to how her impairments impact her ability to work in a competitive environment, and "failed in his duty to order consultative examinations to determine [her] mental and physical functional capacity to do work." [#13 at 22-23]. Thus, Plaintiff appears to assert that the ALJ should have ordered a consultative exam as to all of her impairments.

The claimant bears the burden to prove disability in a social security case. *See, e.g., Hill v. Sullivan,* 924 F.2d 972, 974 (10th Cir. 1991). However, the ALJ is responsible for ensuring "that an adequate record is developed during the disability hearing consistent with the issues raised." *Henrie v. United States Dep't of Health & Human Servs.,* 13 F.3d 359, 360–61 (10th Cir. 1993). "The ALJ should order a consultative exam when evidence in the record establishes the reasonable possibility of the existence of a disability and the result of the consultative exam could reasonably be expected to be of material assistance in resolving the issue of disability." *Hawkins v. Chater,* 113 F.3d 1162, 1169 (10th Cir. 1997). Pursuant to 20 C.F.R. § 404.1519a(b), an ALJ "may purchase a consultative examination to try to resolve an inconsistency in the evidence, or when the evidence as a whole is insufficient to allow us to make a determination or decision on your claim." "The standard is one of reasonable good judgment." *Id.* at 1168. *See also Diaz v. Secretary of Health and Human Services,* 898 F.2d 774, 778 (10th Cir. 1990) (holding that the ALJ did not err in failing to order a consultative examination where the claimant presented no objective evidence that he suffered from

depression).   For the reasons discussed below, I find that the ALJ sufficiently developed the record and did not err in failing to procure a consultative examination for Plaintiff.

    1.  <u>Seizure Activity and Headaches</u>

The ALJ began with consideration of Plaintiff's June 21, 2010 hospital visit and found as follows.  On June 21, 2010, Plaintiff was admitted to Memorial Hospital for a reported syncopal episode.  Her vital signs were normal; an MRI, MRA, and MRV of her brain were negative; no seizure activity was reported during her hospitalization and an electroencephalogram ("EEG") was negative.  [#10-2 at 48; #10-10 at 19, 21, 23, 27, 34-36].  The consultation report from that visit, signed by Thomas E. Bowser, M.D., noted that Plaintiff had a panic attack at one point, "[s]he had a buzzing feeling, her eyes went black, and she apparently passed out," but that "[o]verall, description of these problems are more chronic tension type or stress induced headache."  [#10-10 at 20, 29].  Plaintiff was discharged on June 24, 2010.  [#10-2 at 48].

On August 17, 2010, Plaintiff presented to the emergency room of Memorial Hospital reporting a history of losing consciousness, and denying seizures or any type of cardiogenic syncope.  She denied any chest pain, shortness of breath, or abdominal pain, and complained only of a headache.  She stated she was taking Depakote. A CT scan of her head returned as negative; and she was observed as awake, alert, and oriented.  She received a couple of Norco and a dose of Dilaudid and was discharged.  [#10-2 at 49; #10-10 at 41-42].

On August 18, 2010, Plaintiff returned to the emergency room reporting shaking, tremors, and difficulty speaking.  Her vital signs were normal, the EEG did not show any evidence of seizure activity, and she was perceived as alert and oriented without distress.  [#10-10 at 46].  She was observed as having "unusual tremors throughout the right side of her face and right arm with pill-rolling-type tremor in the right hand and some diffuse tremors throughout the

rest of her body as well." [#10-10 at 48].  The psychiatric report observed, "[i]t is difficult to tell whether this is a psychosomatic reaction or not.  If it is she is an extremely good actress, but does seem when I distract her with complicated questions and tasks the tremor seems to dramatically decrease and she is possibly distractable from it." [*Id.*]  The physician further opined:

> I think there is a good chance it could a variant of pseudoseizure.  Depakote does cause tremors in some selective individuals and it could be related to Depakote.  Asthenic reactions can happen with Depakote as well.  I do not think it is seizure activity.  I do not think it is anything dangerous.

[*Id.*]

On August 19, 2010, Plaintiff returned to the emergency room reporting a headache and two days of progressive stuttering and tremors.  She displayed no other visual or neurological symptoms.  She was observed as awake and alert, "some stuttering speech and some tremor, but not confused or agitated, very pleasant and polite," with no visual or other neurological symptoms, and her vitals were normal.  [#10-10 at 54].  The report noted a possible drug reaction to Depakote and she was instructed to stop taking the drug.  Plaintiff was discharged with dose of Ativan and Vicodin.   [#10-10 at 54-55].

On August 22, 2010, Plaintiff was admitted to Memorial Hospital with complaints of headache, right upper extremity tremor, and stuttering speech. She displayed no facial droop or focal weakness, no aphasia was reported, all testing and examinations returned negative.  An EEG showed no abnormalities.  An MRI of her brain was negative.  [#10-2 at 49; #10-10 at 58-63].  Plaintiff was diagnosed with conversion reaction.  [#10-10 at 61].  The attending physician noted that the on-call neurologist "felt that the tremors are caused by Depakote," and that the drug should "wear out" of Plaintiff's system.  [#10-10 at 64].  The physician also observed:

> [Plaintiff] cannot function in life. She cannot talk enough to say a sentence or coherent thought because the stuttering is so severe and she has right-sided tremors.  She has a chronic headache which she had for a year but there are no

> changes in regards to that.  She has had MRIs, CTs and extensive studies and that is not changing.  She is not complaining of pain here.  She just would like the tremors to stop or she would like to see a neurologist so that she can try to get on track with getting it fixed.

[*Id.*]  Plaintiff was transferred to a different hospital for a neurology consultation, which was not available at Memorial Hospital.  Ms. Williams declined ambulance transport and elected to assume her own mode of transportation.  [#10-10 at 65].

On November 22, 2010, Plaintiff presented to the Memorial Hospital emergency room with a twitch in her right arm, neck shaking, and stuttering.  Her vital signs were normal and respiratory, cardiovascular, abdominal, endocrine, and psychiatric examinations were negative.  The report indicates that Plaintiff's arm was observed jerking in an erratic fashion, which abated when she was distracted.  Valium, Benadryl, and Phenergan were administered to Plaintiff and she was discharged.  [#10-2 at 49; #10-10 at 96-97].  The attending physician observed, "I certainly still consider the possibility of a neurological issue, medication reaction, multiple other etiologies but I must tell you [Plaintiff's] exam is extremely distractible and seems this to be much more psych related than anything."  [#10-10 at 97].

On May 22, 2011, Plaintiff presented to the emergency room with complaints of a headache lasting six days.  [#10-2 at 53].  She denied nausea or vomiting and she was not photophobic or phonophobic.  Despite her history of migraines, she did not believe the headache was a migraine.  She recalled bumping her head under a cupboard but denied any loss of consciousness.  Plaintiff had been taking Chantix for four days but stopped when the headache started.  All examinations were negative.  Plaintiff had no sinus tenderness.  A CT scan of her head was normal.  She reported pain relief after receiving Toradol, Benadryl, Reglan, and Dilaudid, and was discharged.  [#10-2 at 53-54; #10-10 at 140-142; #10-11 at 2].

Plaintiff returned to the emergency room on June 12, 2011, complaining of seizures. Her vital signs were normal and respiratory, cardiovascular, abdominal, endocrine, and psychiatric examinations were negative. Plaintiff stated that she continues to drive. [#10-2 at 49; #10-11 at 4-5]. The attending physician observed:

> Very unusual lady. On review of old records, I cannot find anything that shows that she has true significant seizures. No sign of any postictal period here. Twice while she is in our emergency department, we are called to the bedside with somebody telling us, either a friend or her saying that she is having a seizure. She is awake, alert, able to stop this each time. She does have a little myoclonic jerking a couple times which appears to be more voluntary. I really get a huge impression that this is an underlying psychiatric problem rather than being truly neurological. I did some blood lab including a prolactin, which is pending. CMP, which is negative and CBC which is normal. Head CT which shows no acute infiltrate. She has had normal head CTs in the past. Similar unusual presentation in the past.

[#10-11 at 5, 8].

Plaintiff returned to the emergency room on October 13, 2011, complaining of seizures. She stated that she had experienced five seizures that day, and during the final seizure she fell from her car and struck the back of her head. [#10-2 at 50; #10-11 at 33]. Her complete examination was negative and she was observed as alert and well-oriented. There was no evidence of closed head injury or intracranial injury, or of status epilepticus with seizures. Exam results demonstrated that Plaintiff had not experienced a tonic-clonic seizure within the previous five days. There was no evidence of hip, pelvic, or coccygeal fracture. Plaintiff was discharged home after receiving morphine and Zofran for pain. [#10-11 at 33-35, 39-40].

Plaintiff returned to the emergency room on November 7, 2011, complaining that she had hurt her head. [#10-2 at 50; #10-11 at 44]. She reported suffering "multiple blackout seizures," during which she hit her head five times. These seizures were unwitnessed, and she was unable to describe the type of seizures she had previously experienced (tonic-clonic, absence, or focal).

While waiting to be seen by a physician, Plaintiff had stopped speaking mid-sentence and her head had dropped for seconds before she lifted it and resumed speaking.   [#10-11 at 44]. Plaintiff's examinations were negative and there were no signs of trauma to her head or face. She reported no neck or back pain.   She reported experiencing a headache and was given Norco. The records of this visit reflect that Plaintiff was alert without cognitive defect, she intermittently texted on her cell phone, and she laughed and joked.   The attending physician observed that her behavior was somewhat inappropriate and that she did not appear ill.   [#10-11 at 44-45]. Plaintiff insisted on a CT scan before being discharged, and stated she needed additional medication for her pain.   [#10-11 at 46].

Plaintiff returned to the emergency room days later on November 12, 2011, complaining that she had experienced multiple seizures throughout the day while at work.   [#10-2 at 50; #10-11 at 49].   She reported no related complaints other than a headache; she showed no signs of trauma or neurological deficit; and her examinations were normal.   The attending physician noted that Plaintiff had presented to the same emergency department several times in previous months and had received four normal CT scans during those visits.   [#10-11 at 49].   The physician further noted, "I cannot confirm with anyone what these seizures look like, if, in fact, they did occur.   I am going to simply speak with her neurologist to try to get a sense of whether these are genuine seizures or not."   [#10-11 at 50].   The physician wrote in the report that there was "no indication for further care here at this time for what may or may not have even been seizure activity."   The physician opined, "I think it is very unusual that she refuses to provide any information or try to get a hold of somebody at work who could tell us what these look like, even though she works at Verizon where they should easily have a phone that they would pick up…"   Finally, the physician stated, "I think she is blocking our investigation as to what actually

happened, does not evidence any signs of neuro deficit, and may certainly have pseudoseizure." [#10-11 at 50].

On December 26, 2011, Plaintiff presented to the emergency room complaining of a severe headache.  [#10-2 at 54].  She was observed as alert and well-oriented and not in distress. She displayed no signs of head trauma, and her eyes appeared normal despite her complaint that "her right eye had started to fade out black a little bit."   [#10-11 at 53, 54].   Plaintiff's respiratory, cardiovascular, neurologic, abdominal, and musculoskeletal examinations were normal.  A CT scan was normal.  Plaintiff received Morphine for pain and was discharged.  [#10-2 at 54; #10-11 at 52-57].

Plaintiff returned to the emergency room on January 3, 2012, complaining of a seizure that occurred earlier in the day and reporting "17 spells" from the previous day.  [#10-2 at 50; #10-11 at 59].  The seizure and episodes were not witnessed.  She had no tremors or weakness; her examinations were normal; and her lab results were normal.  Plaintiff was discharged with instructions to take her medication as prescribed.  [#10-11 at 59-60].

Plaintiff returned to the emergency room on May 4, 2012, complaining that her right arm and the right side of her head had been twitching for approximately one hour.  [#10-2 at 51; #10-16 at 44].  She was observed making twitching motions with her right arm and neck, which increased when the attending physician spoke to and examined her.  The physician opined that the twitching was not organic nor a medical emergency, and likely related to anxiety.  Plaintiff received a shot of Cogentin, the twitching ceased, and she was discharged.  [#10-16 at 44-46].

On June 21, 2012, Plaintiff presented to Memorial Hospital stating she had experienced a seizure and injured her right wrist and hand.  [#10-2 at 51].  No one had witnessed the seizure. Plaintiff denied any head, neck, back, pelvic, or abdominal injury.  Her examination was normal,

other than confirming tenderness in her right wrist and second and fourth fingers. X-rays showed no fractures and she had full range of motion of her wrist and fingers. The attending physician administered Norco, secured a wrist splint, and discharged Plaintiff. [*Id.*; #10-16 at 39-43].

Plaintiff presented at Colorado Springs Health Partners in August 2012, complaining of recurrent spells of losing consciousness. [#10-2 at 51; #10-12 at 5]. The examining physician noted suspicion that Plaintiff's "spells are nonepileptic partly because clinically she has atypical features (head extends and back arches during motor spell and she sometime [sic] has some preserved awareness during motor spell." The physician also noted that Plaintiff had never had a spell while driving. [#10-12 at 5]. In this report, for the first time, Plaintiff is listed with musculoskeletal issues of "numbness/tingling sensations, frequent back pain and joint pain," and psychiatric issues of "nervousness/anxiety." [#10-12 at 6].

The ALJ concluded his findings on Plaintiff's seizure activity and complaints of headaches by determining, "[t]he evidence of record does not support the severity of impairment alleged by the claimant. Multiple MRI, CT scans, and EEG were normal and more than one hospital physician doubted the claimant actually had seizures at all." [#10-2 at 51]. The ALJ further concluded, "[t]he records do not support a finding of a severe work limiting impairment secondary to headaches." [#10-2 at 54]. Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996) (quotations and citation omitted). I find that the ALJ thoroughly summarized the medical record as to Plaintiff's history of seizures and headaches and that his findings are substantially supported by the record.

2. Back Pain

The ALJ next considered Plaintiff's complaints of lumbar issues and found as follows. On February 29, 2012, Plaintiff presented to the emergency room complaining of low pack pain lasting three days and blood in her urine. [#10-2 at 53]. Her kidney function was determined to be normal; her cardiovascular, respiratory, musculoskeletal, endocrine, and neurologic examinations were negative; her psychiatric evaluation was negative; x-rays of her abdomen were negative. The attending physician administered Zofran and Toradol and Plaintiff received Norco and Zofran upon discharge with instructions to increase her hydration. [*Id.*; #10-16 at 57-65].

Plaintiff presented to the University of Colorado Hospital in September 2012, complaining of back pain that had plagued her since a motor vehicle accident in 1998. [#10-2 at 51]. She reported that the pain increased in 2004, when she fell down a flight of stairs, and currently radiated through her buttocks, legs, and feet. She stated that she had participated in multiple sessions of physical therapy and received multiple steroid injections, which had helped at first but since ceased to provide relief. Plaintiff also reported having suffered multiple closed head injuries as a child and teenager, and represented that she seldom drank alcohol and never used drugs. Plaintiff was observed as alert and oriented, with normal reflexes, muscle tone, and coordination, and with a normal range of motion and no evidence of edema or tenderness. [*Id.*; #10-11 at 105-106]. An MRI of her lumbar spine revealed L5-S1 tranforaminal lumbar interbody fusion with posterior annulus fibrosus and herniation with minimal to mild narrowing of the spinal canal. [#10-2 at 51; #10-16 at 25].

On November 15, 2012, Plaintiff underwent L4-5 and L5-S1 tranforaminal lumbar interbody fusion with posterior instrumentation without complication. [#10-2 at 51; #10-13 at 3-

9].  On November 18, 2012, Plaintiff was cleared by physical therapy and occupational therapy and was discharged with Vicodin, Valium, and Gabapentin for pain and Colace to prevent constipation.  [#10-2 at 52; #10-13 at 9].  The report noted that her incision was healing well with minimal erythema around the staple line; she had good movement of both lower extremities with full strength and normal tone and bulk; x-rays showed stable and good hardware position; and the headache of which she complained was considered to be consistent with a spinal fluid leak.  [#10-2 at 52; #10-13 at 3-12].

On November 23, 2012, Plaintiff presented to the emergency room with complaints of a headache lasting eight days, since her back surgery.  She denied fever, neck stiffness, or trauma. Her examination was normal and she was discharged to follow up with the surgeon on Monday. [#10-2 at 52; #10-16 at 10-13].

Plaintiff thereafter received a blood patch to help her headaches, but apparently with no effect.  She complained of burning pain and hypersensitivity pulsing down her leg to the top of her left foot.  An MRI revealed a large amount of fluid around the dorsal elements of the spinal column associated with the L4-5 disc space.  Plaintiff underwent surgery on December 7, 2012 to repair the cerebrospinal fluid leak.  Several days later, Plaintiff reported she had been without headache pain since the surgery, but continued to feel sharp pains and a burning sensation in her left foot.  A left leg ultrasound was negative for any sign of DVT.  Plaintiff began to increase her weight bearing ability with physical therapy and exercise, and her pain level decreased.  She was discharged on December 13, 2012.  [#10-2 at 52; #10-13 at 14-28].

The ALJ concluded his findings on Plaintiff's back pain by determining, "[t]he records support a finding of a severe back impairment, however, they do not support the severity of impairment alleged by the claimant."  [#10-2 at 52].  I find that the ALJ thoroughly summarized

the medical record as to Plaintiff's history of lumbar problems and that his findings are substantially supported by the record.[2]

  3.  Mental Health

Plaintiff sought treatment from Aspen Pointe for mental health concerns from August 2009 through February 2011 and from January 2012 through September 2012.  The ALJ found that the records beginning in November 2010 reflect that Plaintiff was feeling okay and she felt that she improving all around.  [#10-2 at 54; #10-7 at 40-42].  She remarked that she is "still getting manic.  I am staying up late.  I was superman on crack yesterday."  [#10-7 at 40].  She denied suicidal ideations.  She represented that she drinks once or twice a year and binges on those occasions; she had alcohol poisoning last time she drank.  [*Id.*]  She was observed as alert and well-oriented with normal speech, and fair judgment and insight.  [#10-7 at 41].  She reported that her family and friends were supportive.  At that time, she was employed as a manager at Pizza Hut.  [#10-7 at 41].  The records from December 2010 also reflect that Plaintiff was observed as alert, well-oriented, and appropriate.  [#10-2 at 54; #10-7 at 44-46].  Plaintiff's chief complaint was, "I've been a total wreck.  I'm crying all the time.  I'm depressed one day; off the charts high the next.  I'm antsy.  I went to the emergency room because my head was shaking.  They said it was in my head."  [#10-7 at 44].    She was observed as calm, smiling

---

[2] Plaintiff did not raise abdominal or cardiovascular issues as disorders to form a basis for severe impairments to the ALJ at the hearing, and she does not contend now that the ALJ improperly excluded these additional conditions in his consideration of her disability claims.  Therefore, this court does not pass on these undeveloped arguments and considers them waived. *See Thao v. Colvin*, 14-cv-1793-RBJ, 2015 WL 4748022, *4 (D. Colo. Aug. 12, 2015) (*citing Murrell v. Shalala*, 43 F.3d 1388, 1389 n.2 (10th Cir. 1994) (holding that "a few scattered statements" in plaintiff's argument are merely "perfunctory complaints [that] fail to frame and develop an issue sufficient to invoke appellate review")).  Nevertheless, this court notes that the ALJ summarized the medical records associated with these conditions, *see e.g.* [#10-2 at 52-53; #10-10 at 79-85, 131-132, 133, #10-11 at 10-12, 15-16].

frequently, and "appeared euthymic, which was incongruent to client's self-ratings." [#10-7 at 45].

The records from January 2011 show that Plaintiff had quit her job; she stated that it had made her too anxious. [#10-2 at 54; #10-7 at 49]. She was "[d]oing odd jobs" and "[b]abysitting at times." [#10-7 at 49]. She was observed as alert, calm, and well-oriented. Her mood was euthymic and she smiled frequently. She stated that she felt more anxious but "much less depressed than last visit." [#10-7 at 50]. Her thought process was clear and coherent and her speech was normal; her judgment and insight were fair. [#10-2 at 54; #10-7 at 49].

In February 2011, Plaintiff reported feeling awful and that she had not taken her medication for one week. She was nonetheless observed as alert, well-oriented, appropriate and calm; her mood was euthymic and she smiled frequently. Her thought process was clear and coherent and her speech was normal; her judgment and insight were fair. [#10-2 at 54; #10-7 at 53]. She was advised to take her medications as prescribed. [#10-7 at 54].

In March 2011, Plaintiff reported feeling overwhelmed but "okay for the most part." She denied suicidal ideations and stated she was sleeping "[l]ike a rock." She was observed as well-oriented, alert, and calm. Her mood was euthymic and she smiled frequently. Her thought process was clear and coherent and her speech was normal; her judgment and insight were fair. [#10-2 at 54; #10-7 at 56].

The ALJ noted that the Aspen Pointe records from April, May, and June 2011 reflect the same observations of Plaintiff as alert, well-oriented, and calm, with a euthymic mood; she smiled frequently, her thoughts were clear and coherent with normal speech, and judgment and insight were fair. [#10-2 at 54; #10-7 at 60-68]. Plaintiff represented feeling calmer and more

relaxed.   She displayed or communicated moderate difficulty in social or occupational functioning, and she continued to work at odd jobs.

The records from July, August, and September 2011 demonstrate that while Plaintiff alleged increasing symptoms, she was observed as calm, alert, and well-oriented.   Again, she was noted as smiling frequently and with a euthymic mood, and maintaining a clear thought process with coherent and normal speech.   [#10-2 at 54-55; #10-7 at 73, 76, 77, 81, 82, 85, 86]. In December 2011, Plaintiff was described as presenting in a sedated manner, "but is able to have a conversation and states she is okay to drive."   [#10-7 at 102].

The records from January 2012 indicate that Plaintiff had begun reporting improved symptoms.   She expressed an increased ability to cope with anxiety and that her mood was less depressed.   Plaintiff was smoking marijuana daily at this point and wished to cease taking her medications.   The records from this time showed only moderate impairment in her functional ability.   [#10-2 at 55; #10-11 at 71, 78].   She was also "adamant" that she wanted to be taken off her bipolar medication; she "does not believe she is bipolar—her mania was side effect of her anti-convulsant meds."   [#10-11 at 83, 84].   She was assessed at this time as not suicidal/homicidal, not psychotic, not an imminent danger to herself or others, and able to care for herself.   [#10-11 at 84].

In February 2012, Plaintiff denied hallucinations or delusions; she was assessed as having linear and organized thoughts and an intact cognitive process.   She again denied any suicidal ideations, or that she suffers from bipolar disorder, and expressed her intent to wean herself off of the associated medications.   [#10-2 at 55; #10-11 at 86].   In March 2012, Plaintiff reported feeling depressed and manic, with increased anxiety and paranoia.   She was still not taking her medication as prescribed, preferring to medicate with marijuana.   [#10-2 at 55; #10-11 at 89].

23

She was nonetheless observed as alert and well-oriented with euthymic mood and congruent affect.  Her thoughts were recorded as clear and coherent, her speech as normal, and her judgment and insight as fair.  [#10-2 at 55; #10-11 at 89-91].  Between June and September 2012, Plaintiff complained of increased anxiety and worry; however, her thoughts remained clear and coherent and her judgment and insight remained fair.  [#10-2 at 55; #10-11 at 95, 99-100]

Additionally, the treating records concerning other maladies, discussed above, similarly reflect that Plaintiff was observed as alert and well-oriented with a normal mood and affect.  This is reflected in the Colorado Springs Health Partners records dated December 2011 through September 2012.  [#10-2 at 55; *see* #10-12 at 2-62].  The records from Memorial Hospital dated November 2009 through November 2012 reflect Plaintiff as alert and oriented with normal psychiatric presentation.  [#10-2 at 55; *see* #10-10; #10-16 at 2-74].

Accordingly, the ALJ concluded his findings on Plaintiff's mental health by determining, "[t]he medical records do not support a finding of a severe, work limiting impairment due to any mental health issues."  [#10-2 at 55].  This conclusion is supported by the fact that Plaintiff's health care providers systematically concluded that Plaintiff's self-reported limitations were not substantiated by clinical findings.  I find that the ALJ thoroughly summarized the medical record as to Plaintiff's history of mental health, including Plaintiff's self-reports of limitations, and that his findings are substantially supported by the record.

Based on the record as developed by the ALJ, and recounted herein, I respectfully disagree with Plaintiff that the ALJ improperly failed to order consultative examinations to determine her mental and physical functional capacity to work.  The record, thoroughly summarized by the ALJ, does not indicate inconsistencies or gaps; nor does it establish both the reasonable possibility of the existence of a disability and the expectation that a consultative exam

could materially assist the ALJ in resolving the issue of disability.  *See Hawkins*, 113 F.3d at 1169.  Furthermore, neither Plaintiff nor her representative raised the issue of a consultative examination at the time of the hearing.  *See Shortnacy v. Colvin*, No. CIV–13–297–HE, 2014 WL 4716075, at *6 (W.D. Okla. Aug. 26, 2014) ("The ALJ's failure to purchase a consultative examination was not erroneous given that Plaintiff failed to raise the issue and that the issue was not substantial on its face.") (citation omitted).  Indeed, Plaintiff does not assert which records or maladies the ALJ failed to consider, or for which a consultative examination would have been materially useful.  *Cf. Madrid v. Barnhart*, 447 F.3d 788, 791 (10th Cir. 2006) (holding ALJ committed reversible error by not requesting *pro se* claimant's rheumatoid factor test results where the test results were in existence at the time of the hearing and available and the ALJ was aware the test was performed, and remanding for further development of the record concerning claimant's claims of a rheumatological disorder).  I cannot find that the ALJ failed to exercise reasonable good judgment in his decision to rely exclusively on the record, Plaintiff's testimony, and the testimony of the VE.

## C.     ALJ's Assessment of Plaintiff's RFC

Ms. Williams also contends the ALJ's findings regarding her physical RFC, including but not limited to her capacity to sit without considerable pain, are not supported by substantial evidence[3]; and that the ALJ erred in determining her mental impairments are not severe, and in the alternative, erred in failing to consider the impairments in assessing her RFC.

---

[3] Although Plaintiff qualifies her argument as "including but not limited to," she does not actually assert an error as to the ALJ's findings with regard to her physical RFC other than for the amount of time she testified she could comfortably sit.  Therefore, I will address only this argument.

1.  <u>RFC Assessment as to Physical Conditions</u>

First, and as addressed above, the record supports the ALJ's findings that (1) Plaintiff suffers impairments consisting of a seizure disorder and disorder of the back; and (2) the evidence of record does not support the severity of either of these impairments as alleged by Plaintiff.  As to Plaintiff's argument that the ALJ improperly neglected to assign restrictions on account of her representation that she can sit for no longer than approximately 25 minutes, there is simply no support anywhere in the treating records for including this limitation, other than Plaintiff's own testimony.  She does not cite the court to corroborating opinions of any physician or provider.  Nor does Plaintiff raise any challenge as to the ALJ's assessment of her credibility, which he considered as follows: "[t]he medical records and the claimant's testimony cast doubt on her credibility and/or reliability as multiple physicians have told the claimant not to drive due to her allegations of seizures, syncope, blacking out, etc., but the claimant continues to drive…" [#10-2 at 57].  Relying on the treating records, which show in part that Plaintiff healed well after her spinal fusion and the operation to repair the cerebrospinal fluid leak, the ALJ determined that Plaintiff has an RFC to perform sedentary work with certain limitations regarding bending and squatting, use of foot and leg controls, heights, and hazardous machinery and work areas.  *See* [#10-2 at 56].  I find that this RFC is substantiated by the record before me.

Ms. Williams also appears to suggest that the RFC is in error because "there is no expert opinion evidence regarding [her] physical functional capacity" and no "substantial evidence to support the conclusion that she could sit for an extended period of time during the workday." [#13 at 24-25].  However, "there is no requirement in the regulations for a direct correspondence between an RFC finding and a specific medical opinion on the functional capacity in question." *Chapo v. Astrue*, 682 F.3d 1285, 1288-89 (10th Cir. 2012) (citing *Howard v. Barnhart*, 379 F.3d

945, 949 (10th Cir. 2004)).  *See also* 20 C.F.R. §§ 404.1527(e)(2), 416.927(e)(2).  Furthermore, it is Plaintiff's burden to demonstrate a disability, and as is relevant here, to demonstrate that she cannot sit for longer than twenty-five minutes.  She has not met that burden.

> 2.  <u>RFC Assessment as to Mental Health</u>

> a. *Legal Standard*

The Social Security Act provides that an impairment is severe if it "significantly limits an individual's physical or mental abilities to do basic work activities."  Social Security Ruling 96-9p.  At step two, "[t]he Commissioner follows a special technique to evaluate the severity of mental impairments and their effect on the claimant's ability to work. In applying the special technique, the ALJ must first decide whether the claimant has a medically determinable mental impairment."  *Wells v. Colvin,* 727 F.3d 1061, 1068 (10th Cir. 2013) (citing 20 C.F.R. §§ 404.1520a(b)(1), 416.920a(b)(1).  Where a medically determinable impairment is found, the ALJ then rates the "degree of functional limitation" caused by the impairment(s) in "four broad functional areas."  20 C.F.R. §§ 404.1520a(c)(3), 416.920a(c)(3).  These areas are (1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation. *Id.*  For the first three areas, the ALJ assigns a rating of none, mild, moderate, marked, or extreme.  *Id.* §§ 404.1520a(c)(4), 416.920a(c)(4).  For the fourth area, the ALJ determines how many episodes of decompensation the claimant has had and assigns one of the following ratings: none; one or two; three; or four or more.  *Id.*  If the claimant is assigned ratings of "none" or "mild" in the first three areas and the ALJ determines she has had no episodes of decompensation, the ALJ "will generally conclude that your impairment(s) is not severe, unless the evidence otherwise indicates that there is more than a minimal limitation in your ability to do basic work activities."  *Id.* §§ 404.1520a(d)(1), 416.920a(d)(1).  "[T]he

claimant must show more than the mere presence of a condition or ailment." *Hinkle v. Apfel*, 132 F.3d 1349, 1352 (10th Cir. 1997) (citing *Bowen v. Yuckert,* 482 U.S. 137, 153, 107 S.Ct. 2287, 2297, 96 L.Ed.2d 119 (1987) (step two designed to identify "at an early stage" claimants with such slight impairments they would be unlikely to be found disabled even if age, education, and experience were considered).

    b. *Application*

It is not altogether clear whether the ALJ found at step two that Plaintiff had no medically determinable mental impairment, or simply a non-severe mental impairment. *See* [#10-2 at 48]. He recounted and summarized the medical records from Aspen Pointe from November 2010 through September 2011 and January 2012 through September 2012, and the results and observations associated with the general psychiatric evaluations administered at Colorado Springs Health Partners between December 2011 and September 2012 and at Memorial Hospital between November 2009 and November 2012, and determined: "[t]he medical records do not support a finding of a severe, work limiting impairment due to any mental health issues." [#10-2 at 54-55]. As stated above, I find that the ALJ thoroughly summarized the medical record as to Plaintiff's history of mental health, his findings are substantially supported by the record, and there is no error in the ALJ concluding that Plaintiff had non-severe mental health impairments. If he indeed found at step two that Plaintiff had no impairment, he was not required to continue to step three as to that issue. *See Wells*, 727 F.3d at 1065 n.3, 1068-69 ("An ALJ could, of course, find at step two that a medically determinable impairment posed no restriction on the claimant's work activities. Such a finding would obviate the need for further analysis at step four. That is not the case here, however; the ALJ did find 'mild' restrictions in three of the relevant functional areas, requiring further analysis."). *See also Williams*, 844 F.2d at 750 (holding that if

the claimant is unable to show that her impairments would have more than a minimal effect on her ability to do basic work activities, she is not eligible for disability benefits.  If, however, the claimant presents medical evidence and makes the *de minimis* showing of medical severity, the decision maker proceeds to step three); *Linville v. Colvin*, No. CIV–12–269–KEW, 2013 WL 5417133, at *3-4 (E.D. Okla. Sept. 26, 2013) (dismissing claimant's arguments that ALJ failed to consider mental impairments in RFC assessment on basis that there was "no mental impairment which imposes a functional limitation upon claimant," and finding that claimant's objection to the analysis at phase two that the ALJ did not include mental impairments in the hypothetical questions "has no merit since no mental impairments are found.").

However, if the ALJ's decision at step two was to find that Plaintiff suffered only mild mental impairments, he was then required to consider those impairments in his assessment of her RFC.  20 C.F.R. §§ 404.1545(a)(1)-(2), 416.945(a)(1)-(2) (At step four, the ALJ "asses[es] your residual functional capacity based on all the relevant evidence in your case record…including your medically determinable impairments that are not severe.").  The ALJ, in fact, revisited Plaintiff's mental health at step four, where he considered and gave significant weight to the opinion of the state agency physician who assessed Plaintiff.  *See* [#10-2 at 58; #10-3 at 4-13, 14-23].[4]  The ALJ agreed with the state agency physician's assessment of "mild restrictions in the claimant's activities of daily living; mild restrictions in the ability to maintain social functioning; and mild limitations maintaining concentration, persistence, or pace"; he noted that

---

[4] "State agency medical and psychological consultants are highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the Act."  Social Security Ruling 96–6p, 1996 WL 374180 at *2 (SSA July 2, 1996).  Plaintiff does not raise a challenge to the ALJ's reliance on the opinion of the state agency psychologist.

the "claimant had no periods of decompensation,[5] each of extended duration"; and found, "[t]his

is consistent with the records as a whole and is given significant weight." [#10-2 at 58].[6]   *See*

*Wells*, 727 F.3d at 1069 (the "RFC assessment must include a narrative discussion describing

how the evidence *supports each conclusion*, citing specific medical facts (e.g., laboratory

findings) and nonmedical evidence (e.g., daily activities, observations)") (citing SSR 96–8p,

1996 WL 374184, at *7) (emphasis in original).

Even if the ALJ erred, as Plaintiff argues, in not providing a more comprehensive

narrative regarding her mental health concerns at step four, I find that such error is not reversible

in consideration of the ALJ's extensive discussion of her complaints as compared to her treating

records at step two.   *See Alvey v. Colvin*, 536 F. A'ppx 792, 794 (10th Cir. 2013) (citing

*Wyoming v. Livingston,* 443 F.3d 1211, 1226 (10th Cir. 2006).   *See also Landreville v. Colvin*,

No. 13–cv–01905–LTB, 2015 WL 361836 (D. Colo. Jan. 28, 2015) (finding that while the ALJ

did not extensively discuss claimant's PTSD at step four, he did note that "[t]he claimant

reported no difficulty getting along with family, friends, neighbors, and authority figures"; the

comment, coupled with the ALJ's extensive analysis of claimant's PTSD at step two, and the

totality of the record sufficed to render the error harmless).   Plaintiff's psychiatric evaluations

---

[5]  "Episodes of decompensation are exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12(C)(4).

[6]  The opinions of state agency physicians generally carry less weight than those of treating and examining sources, *see Robinson v. Barnhart,* 366 F.3d 1078, 1084 (10th Cir. 2004); however, "[i]n appropriate circumstances, opinions from State agency medical and psychological consultants and other program physicians and psychologists may be entitled to greater weight than the opinions of treating or examining sources."   Social Security Ruling 96–6p, 1996 WL 374180 at *3.   *See also Pacheco v. Colvin*, 83 F. Supp. 3d 1157, 1164 (D. Colo. 2015).   Here, the court has not found, and Plaintiff has not cited to, an opinion of any provider that is contradictory to the state agency physician's opinion, nor is the opinion inconsistent with other substantial evidence in the record.

were consistently normal and she insisted repeatedly that she was not bipolar.  To the extent she experienced hallucinations, she did not raise the issue of an impairment caused by hallucinations to the ALJ.  Furthermore, even when suffering from depression or anxiety, she was observed as maintaining a calm and coherent thought process; and, while the treating records reflect that Plaintiff endured spells where she felt sad, paranoid, anxious, or worried, she was consistently described as euthymic and smiling.  The court "may neither reweigh the evidence nor substitute [its] judgment for that of the agency."  *White*, 71 F.3d at 1260.  And, "[t]he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence."  *Lax*, 489 F.3d at 1084.   In conducting its review, the court "should, indeed must, exercise common sense." *Alvey*, 536 F. App'x at 794.  In consideration of the ALJ's thorough discussion and recitation of the treating records regarding Plaintiff's mental health, I decline to remand on the basis that the RFC was incomplete, concluding that "the evidence in this case does not support assessing any functional limitations from mental impairments" and "reversal would result in futile and costly proceedings." *Id.*

**D.    ALJ's Assessment of Plaintiff's Seizure Disorder**

Finally, Ms. Williams argues the ALJ erred in failing to consider whether her seizure disorder met or equaled the severity of listing 12.07 in 20 C.F.R. Part 404, Subpart P, Appendix 1.  In the alternative, Plaintiff argues that the ALJ erred in failing to assign restrictions relating to her seizures in the RFC.  [#13 at 27].  Defendant asserts that Plaintiff's seizure disorder is not medically documented, as is required to meet the listing, and that the ALJ sufficiently accounted for Plaintiff's seizure disorder in the restrictions articulated.

At step three, the ALJ determines pursuant to 20 C.F.R. §§ 404.1520(d) and 416.920(d), "whether the impairment is equivalent to one of a number of listed impairments that the Secretary acknowledges are so severe as to preclude substantial gainful activity."  If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be disabled.  *Davidson v. Secretary of Health & Human Serv's.*, 912 F.2d 1246, 1251 (10th Cir. 1990).  Plaintiff has the burden at step three of demonstrating, through medical evidence, that her impairments meet all of the specified medical criteria contained in a particular listing.  *Riddle v. Halter,* 10 F. A'ppx 665, 667 (10th Cir. 2001).  An impairment that manifests only some of the criteria, no matter how severely, does not qualify.  *Sullivan v. Zebley,* 493 U.S. 521, 530, 110 S.Ct. 885, 891, 107 L.Ed.2d 967 (1990).  "Because the listed impairments, if met, operate to cut off further inquiry, they should not be read expansively."  *Mount v. Astrue*, No. 08–1097–WEB, 2009 WL 1360089, at *4 (D. Kan. May 14, 2009) (citation omitted).

The ALJ here determined Plaintiff did not meet listed impairments 1.00 (musculoskeletal system) and 11.00 (neurological) on the basis that "the clinical, laboratory and/or radiographic findings necessary to meet a Listing level impairment have not been established."  [#10-2 at 56]. As addressed above, I find this conclusion is substantially supported by the record.

To the extent Plaintiff argues the ALJ should have considered whether her seizure disorder equaled the severity of listing 12.07, I find she has not satisfied her burden.  Listing 12.00 concerns mental disorders and listing 12.07 specifically pertains to Somatoform Disorders, which are used to describe "[p]hysical symptoms for which there are no demonstrable organic findings or known physiological mechanisms."  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.07.  As Plaintiff notes in her brief, the symptoms must meet the following criteria for the condition to amount to severe:

A. Medically documented by evidence of one of the following:

    1. A history of multiple physical symptoms of several years duration, beginning before age 30, that have caused the individual to take medicine frequently, see a physician often and alter life patterns significantly; or

    2. Persistent nonorganic disturbance of one of the following:

        a. Vision; or

        b. Speech; or

        c. Hearing; or

        d. Use of a limb; or

        e. Movement and its control (e.g., coordination disturbance, psychogenic seizures, akinesia, dyskinesia; or

        f. Sensation (e.g., diminished or heightened).

    3. Unrealistic interpretation of physical signs or sensations associated with the preoccupation or belief that one has a serious disease or injury;

AND

B. Resulting in at least two of the following:

    1. Marked restriction of activities of daily living; or

    2. Marked difficulties in maintaining social functioning; or

    3. Marked difficulties in maintaining concentration, persistence, or pace; or

    4. Repeated episodes of decompensation, each of extended duration.

*Id.*

With the limited and apparently isolated events of Plaintiff's tremor in August 2010 that affected her speech, use of a limb, and movement and control, there is no evidence in the record indicating a "persistent nonorganic disturbance" of any of the functions listed in (A). Moreover, Plaintiff has not demonstrated that she meets any of the criteria listed in (B). Ms. Williams continued to drive throughout the time in question, both for work and to the hospital and for doctor appointments [#10-10 at 59, 84]; she socialized with her friends; she participated in hobbies such as painting, jewelry making, journaling, and playing the violin [#10-11 at 72]; and she was observed as able to care for herself. Furthermore, the state agency physician determined that Plaintiff suffered only mild, not marked, restrictions in daily living, social functioning, concentration and related abilities, and no repeated episodes of decompensation, which

assessments the ALJ found were supported by the record.  Any error made in the ALJ's failure to consider listing 12.07 is harmless.  *See Wilson v. Barnhart*, 82 F. A'ppx 204, 210-11 (10th Cir. 2003) ("Although the ALJ did not specifically refer to listing 12.07 in his decision, we nonetheless conclude that the ALJ's decision contains sufficient findings regarding plaintiff's mental status to constitute a proper step-three analysis.").

Similarly, I find no reversible error in the restrictions used by the ALJ.  I respectfully disagree with Plaintiff that she has proffered evidence, let alone "substantial, even overwhelming" evidence, that she suffered multiple seizures, and that in one case her seizures caused her to lose her job.[7]  [#13 at 30].  I have already found that the ALJ's assessment of Plaintiff's seizure disorder is substantiated by the evidence.  Furthermore, he determined that while Plaintiff's seizure disorder could reasonably be expected to cause the alleged symptoms, her statements concerning the intensity, persistence, and limiting effects of those symptoms were "not entirely credible"—an assessment with which Plaintiff does not take issue.  [#10-2 at 57 ("[t]he claimant testified that she had seizures 25 days out of the month.  This statement is not supported by any objective findings or testing results.  In fact, the records consistently show all tests, radiographic studies, examinations to be negative and/or normal")].  The ALJ accordingly found that Plaintiff can perform sedentary work as defined in the regulations with certain limitations: occasional bending and squatting; occasional use of foot/leg controls; no unprotected heights; no moving machinery; and no hazardous work areas.  [#10-2 at 56].  I find these limitations are supported by the ALJ's findings.

## CONCLUSION

---

[7] Indeed, the records from Aspen Pointe from December 2010 show that Plaintiff quit her job at Pizza Hut; Plaintiff was quoted as stating she could not "take it anymore, made me too anxious." [#10-7 at 49].  Thereafter, she reported "doing odd jobs and making money that way. Babysitting at times." *Id.*

The court is satisfied that the ALJ considered all relevant facts and that the record contains substantial evidence from which the Commissioner could properly conclude under the law and regulations that Ms. Williams was not disabled within the meaning of Title II and Title XVI of the Social Security Act.  Accordingly, IT IS ORDERED that the Commissioner's final decision is AFFIRMED and this civil action is DISMISSED, with each party to bear her own fees and costs.

DATED: February 23, 2016                    BY THE COURT:


                                            s/ Nina Y. Wang _____
                                            United States Magistrate Judge